**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **SUSAN T. MAZZEI a/k/a** | ) | **Bankruptcy No. 22-20395-JAD** |
| **SUSAN TOROCKIO,** | ) | |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| _____ | X | **Related to ECF Nos. 32, 80 & 88** |
| | ) | |
| **COMMUNITY BANK,** | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| **SUSAN T. MAZZEI a/k/a** | ) | |
| **SUSAN TOROCKIO, and** | ) | |
| **JASON J. MAZZEI,** | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | X | |

## MEMORANDUM OPINION

The matters before the Court are the *Amended Chapter 13 Plan dated April 7, 2023* (the "Amended Plan," ECF No. 88) filed by Ms. Susan T. Mazzei a/k/a Susan Torockio (the "Debtor" or "Mrs. Mazzei"), Community Bank's *Motion for Relief From Stay and Co-Debtor Stay* (the "Motion for Relief From Stay," ECF No. 32), and this Court's *Memorandum Order Directing Debtor to Show Cause Why this Case Should Not be Dismissed With Prejudice and/or Why Relief From Stay Should Not Be Granted to Creditor, Community Bank* (the "Rule to Show Cause," ECF No. 80).

The Court has the requisite subject-matter jurisdiction to hear and decide these contested matters on a final basis. <u>See</u> *Order of Reference* entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984 and 28 U.S.C. §§ 157(b)(1), 157(b)(2)(G), 157(b)(2)(O), and 1334.

Numerous hearings have been held on these matters, including hearings held on August 17, 2022, September 28, 2022, December 7, 2022, January 18, 2023, April 27, 2023 (evidentiary hearing), June 2, 2023, July 11, 2023, and September 13, 2023.

In due consideration of the admissions of record made by or on behalf of the Debtor in this case,[1] and the records made at the hearings referenced above, the Court issues this *Memorandum Opinion* which constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated below, the Court shall enter orders that: (1) deny confirmation of the Debtor's Amended Plan, (2) grant *in rem* relief from stay in favor of Community Bank, and (3) dismiss this bankruptcy case with prejudice.

**I.**

To put each of these contested matters into perspective, "Chapter 13 of the Bankruptcy Code requires a debtor to, in good faith, propose, confirm, and

---

[1] <u>See</u> <u>Nantucket Inv'rs II v. Cal. Fed. Bank (In re Indian Palms Assocs, LTD.).</u>, 61 F.3d 197, 205 (3d Cir. 1995)(holding that the district court properly looked to the record of the underlying bankruptcy case); <u>Job v. Calder (In re Calder)</u>, 907 F.2d 953, 955 n.2 (10th Cir. 1990)(upholding bankruptcy court's taking of judicial notice of omissions in debtor's previously filed statement of affairs and schedule of assets as evidence that debtor had made a false oath); <u>Larson v. Groos Bank, N.A.</u>, 204 B.R. 500, 502 (W.D. Tex. 1996)(statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions).

perform a plan of reorganization that is (among other things) feasible." In re Kelly, 649 B.R. 448, 451 (Bankr. W.D. Pa. 2023)(footnotes omitted); see also 11 U.S.C. § 1325(a)(6), which provides that one of the plan confirmation require-ments is that "the debtor will be able to make all payments under the plan and to comply with the plan[.]"

The words of former Chief U.S. Bankruptcy Judge Eric L. Frank, in the case of In re Blanco, 520 B.R. 476 (Bankr. E.D. Pa. 2014), are prescient with respect to the contested matters currently before the Court. In Blanco, Chief Judge Frank dismissed a debtor's second chapter 13 case (which was pending for six months and which was filed shortly after dismissal of a prior case) due to, *inter alia*, facial infeasibility of the proposed chapter 13 plan in light of the debtor's income and expense disclosures. In re Blanco, 520 B.R. at 484. Dur-ing the course of explaining his rationale, Chief Judge Frank held:

> [T]here is no legitimate purpose for a debtor to remain in chapter 13, and thereby restrain creditors from exercising their rights under applicable nonbank-ruptcy law, if the debtor, after given fair opportunity to do so, has been unable to propose a chapter 13 plan that meets the confirmation requirements of 11 U.S.C. § 1322 and § 1325.

Id. at 483 (citing In re Dempsey, 247 F.App'x 21, 25 (7th Cir. 2007)).

Chief U.S. Bankruptcy Judge Taddonio similarly held that bankruptcy proceedings do not "wait and see" if a debtor's "sworn schedules betray a plan as empty promises or wishful thinking." In re Kelly, 649 B.R. at 452. Rather, as another court explained, "it was never the intent of Congress to allow a per-

son to abuse [the automatic stay] by using it solely for the purpose of delay." In re Whitten, 11 B.R. 333, 339 (Bankr. D.D.C. 1981).

Notwithstanding the duties imposed upon persons seeking the protection of chapter 13 bankruptcy, a small percentage of debtors do abuse the process by prosecuting chapter 13 plans that are patently not feasible from day one of their cases and thus use the bankruptcy system as a vehicle for delay.  It is these types of cases which warrant the denial of plan confirmation, relief from stay for the benefit of affected creditors, and dismissal of the bankruptcy case that was commenced and prosecuted by the debtor without good faith.

## II.

The record before the Court reflects that Community Bank is the Debtor's largest creditor and holds a mortgage against the Debtor's marital residence located at 3238 McAlister Farm Lane, Allison Park, PA 15101 (the "Allison Park Property").  The Debtor and her husband (Mr. Jason Mazzei) value the Allison Park Property as having a fair market value of $1.385 million.[2]

Mr. & Mrs. Mazzei have been severely delinquent on their mortgage to Community Bank since 2016.  The claims register reflects that Community Bank has filed a secured proof of claim indicating that, as of the commencement of this bankruptcy case, Mr. & Mrs. Mazzei owe Community Bank $518,495.28, and that the mortgage arrears due to the bank are at least

---

[2] The source of this valuation is Mr. Mazzei's opinion.  The Court has accepted this valuation solely for purposes of this *Memorandum Opinion*. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993)(no abuse of discretion permitting plaintiff's owner to provide lay opinion testimony).

$151,868.42 (not including amounts which accrued since the petition date).

See Claim No. 5.[3]

Community Bank seeks relief from stay averring that the Debtor and her husband have filed a series of unsuccessful and/or unfeasible bankruptcy cases culminating in the one presently before this Court. According to Community Bank, these serial bankruptcy filings were (and are) designed to frustrate and delay Community Bank's state court foreclosure action, which has been pending for over seven years.

The undisputed timeline of Mr. and Mrs. Mazzei's serial bankruptcy filings, which is summarized below, supports Community Bank's position:

| Date | Court Filings |
|------|---------------|
| June 27, 2016 | Community Bank commences state court mortgage foreclosure action |
| December 30, 2016 | Jason Mazzei files for chapter 11 in the Western District of Pa. at Case No. 16-24827-GLT |
| February 19, 2019 | Final decree is entered in Jason Mazzei's chapter 11.[4] Thereafter Jason Mazzei |

---

[3] Community Bank initially filed its claim at Claim No. 1. Since the claim filed by Community Bank at Claim No. 5 indicates that it amends Claim No. 1, the Court cites only to the claim most recently filed by Community Bank (i.e., Claim No. 5).

[4] Counsel for the Debtor suggests or infers that Mr. Mazzei's chapter 11 case was a success because Mr. Mazzei received a final decree. This suggestion or inference is mistaken. Entry of a final decree and closing of a chapter 11 case often occurs before all the payments under a chapter 11 plan have been completed. See Fed. R. Bankr. P. 3022, Advisory Committee Notes. Entry of a final decree and closing of a chapter 11 case occurs after "substantial consummation" of a plan of reorganization. The term "substantial consummation" is defined in section 1101(2) of the Bankruptcy Code and has three components. First is the "transfer of all or substantially all of the property proposed by the plan to be transferred;" second is the "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan;" and, third, the "commencement of distribution under the plan." 11 U.S.C. § 1101(2). While a final decree can be entered by the bankruptcy court once a chapter 11 plan is "substantially consummated," a "substantially consummated" plan can nonetheless fail if the debtor does not honor the ongo-

|  | fails to honor payment commitments to Community Bank and other creditors |
|---|---|
| April 15, 2020 | Community Bank files in state court an affidavit of service of notice of Sheriff's Sale |
| July 2, 2020 | Susan Mazzei files a chapter 13 in the Western District of Pa. at Case No. 20-22012-TPA. (In light of the bankruptcy, Community Bank continues the Sheriff Sale to September 8, 2020) |
| August 20, 2020 | Susan Mazzei's chapter 13 case is dismissed for failure to file a chapter 13 repayment plan, failure to file schedules of assets and liabilities, and failure to file statement of financial affairs |
| September 4, 2020 | Jason Mazzei files a chapter 13 case four days before the scheduled Sheriff Sale in the District of Maryland at Case No. 20-18222-TJC.[5] (In light of this bankruptcy, Community Bank's Sheriff's Sale is stayed) |
| October 27, 2021 | Jason Mazzei's chapter 13 plan is confirmed by the bankruptcy court for the District of Maryland, however the case is riddled with payment defaults and ultimately fails |
| March 6, 2022 | After notices of default start to be filed in Jason Mazzei's bankruptcy case in Maryland, Susan Mazzei files the instant chapter 13 bankruptcy case before this Court. Plan funding in her case is dependent upon Jason Mazzei's income and Jason Mazzei selling individually owned property |

---

ing commitments set forth in the plan (and that is what happened in Mr. Mazzei's case). See, e.g., In re Jartran, Inc., 71 B.R. 938 (Bankr. N.D. Ill. 1987)(plan default after substantial consummation), decision aff'd, 87 B.R. 525 (N.D. Ill. 1988), judgment aff'd, 886 F.2d 859 (7th Cir. 1989).

[5] When initially filed, Mr. Mazzei's Maryland bankruptcy case was assigned to the Honorable Thomas J. Catliota. Prior to its conclusion, the case was transferred to the Honorable David E. Rice. As such, documents filed in the Maryland bankruptcy case are either captioned as 20-18222-TJC or 20-18222-DER.

| September 9, 2022 | Jason Mazzei's bankruptcy case in Maryland is dismissed for failure to complete payments under his chapter 13 plan |
| September 13, 2023 | At a hearing before this Court, Susan Mazzei (through legal counsel) advises that none of the sales have come to fruition, and essentially admits that the outside funding (or sales) necessary to complete payments under the Amended Plan are not in prospect |

**III.**

Community Bank's position about delay and improper motive is further supported by the fact that the Debtor's present case has been un-feasible since it was commenced, and that the Debtor (along with her husband) repeatedly made failed promises to adequately fund the Debtor's repayment obligations imposed by chapter 13.

Again, as set forth above, this is the fourth bankruptcy petition filed since Community Bank began foreclosure proceedings against the Allison Park Property in 2016. None of the cases, including this one, have been successful.

The debts in this case are not overly complicated. Two mortgages and substantial tax liens encumber the home. The mortgage creditors filed proofs of claim aggregating $637,156.41 noting $193,307.06 in total arrearages. See Claim Nos. 5 & 7. Municipal and local school taxing authorities filed secured claims against the Debtor totaling $173,708.35. See Claim Nos. 8–10.

Thus, based on the Debtor's stated value of the Allison Park Property, there is substantial equity (as summarized below):

| | |
|---|---|
| Value of Allison Park Property | $1,385,000.00[6] |
| Less: Mortgages | ($  637,156.41) |
|     Municipal/School Taxes | ($  173,708.35) |
| Equity | $  574,135.24 |

The Court notes that Mrs. Mazzei did not claim an exemption against the Allison Park Property. See *Schedule C*, ECF No. 12 at ECF p. 9-10.[7] Had she taken an exemption under 11 U.S.C. § 522(d)(1), it would be limited to $27,900 (thus, still leaving substantial equity for creditors).

The Court also notes that had Mrs. Mazzei elected state-law exemptions based on tenancy by the entireties, the Allison Park Property would remain subject to claims of joint creditors of Mr. & Mrs. Mazzei and, as a result, could be liquidated in a hypothetical chapter 7. See, e.g., In re Morgan, No. 21-50455, 2021 WL 5498621 (Bankr. M.D.N.C. Nov. 4, 2021)(analyzing 11 U.S.C. § 522((b)(3)(B) and concluding that entireties property remains subject to claims of joint creditors and may be liquidated by a chapter 7 trustee); see also Sumy v. Schlossberg, 777 F.2d 921 (4th Cir. 1985)(tenancy by the entirety property is subject to administration in bankruptcy for the benefit of joint creditors), and Cech v. Maloney (In re Maloney), 146 B.R. 168, 170-73 (Bankr. W.D. Pa. 1992)(same).

---

[6] In Pennsylvania, a tenancy by entireties is a form of co-ownership of property by husband and wife, with its essential characteristic is that "each spouse is seised *per tout et non per my*, *i.e.*, of the whole or the entirety and not of a share, moiety or divisible part." Johnson v. Johnson, 908 A.2d 290, 295 (Pa. Super. 2006)(quoting In re Gallagher's Estate, 43 A.2d 132 (Pa. 1945)).

[7] The document filed as ECF No. 12 and labeled as "Petition Completed" on the docket is a compilation of several of the Debtor's schedules and statements merged into a single filing. Consequently, the page numbers provided within each of the individual schedules and statements is unhelpful is guiding the reader to the appropriate page without the need to sift through the document. Accordingly, in such situations, this Court opts to refer to the ECF page number ("ECF p."), which runs sequentially through the entirety of the combined document.

All of the monthly payments[8] on the long-term continuing debts as identified in the secured claims against the Allison Park Property are required to be provided for in the Debtor's chapter 13 plan.

In addition, the plan must provide for the payment of the arrearages due Community Bank and First Commonwealth Bank over a "reasonable period of time" but not to exceed sixty months, since the Debtor's Amended Plan proposes to "cure and reinstate" the defaults pertaining to these mortgages. See 11 U.S.C. §§ 1322(b)(3) and 1322(b)(5).

With respect to unsecured creditors, the Commonwealth of Pennsylvania has filed a $32,434.39 unsecured priority tax claim and an $18,356.79 general unsecured tax claim. See Claim No. 2-2.  The local hospital system also filed two unsecured claims aggregating $1,499.75.[9] See Claim Nos. 3-2 and 4-1. These debts (i.e., unsecured and priority taxes, along with medical bills) all appear to be joint and/or marital debts, and therefore should share in any liquidation of the Allison Park Property in a hypothetical chapter 7 case. See In re Maloney, 146 B.R. at 170-73.

---

[8]   The contractual monthly payment on account of the Community Bank mortgage is $2,577.64 per month. See Claim No. 5-1, Ex. A Mortgage Proof of Claim Attachment.  The contractual monthly payment on account of the First Commonwealth Bank mortgage is $827.93. See Claim No. 7-1, Summary of Secured Proof of Claim.

[9]   See Porter v. Karivalis, 718 A.2d 823 (Pa. Super. 1998), where the Pennsylvania Superior Court determined that health care expenses are family necessities for which both spouses are liable.

The Court makes this observation because, given the sizeable equity in the Allison Park Property, the Debtor's chapter 13 plan must also provide for full payment of all unsecured creditors who have filed claims. Such a result is mandated by the "best interests of creditors test" or "liquidation alternative test" set forth in 11 U.S.C. § 1325(a)(4), which provides that unsecured creditors are to receive "value" as of the effective date of the plan in an amount equal to at least what creditors would have received "if the estate of the debtor were liquidated under chapter 7[.]"

The principle behind this rule is fundamental to the equitable nature of bankruptcy. Because the debtor is receiving the benefit of retaining property as a result of chapter 13, and because creditors have lost their ability to undertake the race to the courthouse and execute on their claims, the creditors cannot be made worse off in the chapter 13 when compared to how they would be treated in chapter 7 (which is the bankruptcy chapter where non-exempt assets are not retained by the debtor and are liquidated for the benefit of creditors). See In re Hibbert, 14 B.R. 891 (Bankr. E.D.N.Y. 1981).

Professional fees to counsel for the Debtor are expected to be at least $5,500, and the Chapter 13 Trustee is to be paid percentage fees on distributions per 28 U.S.C. § 586. The Bankruptcy Code requires that these administrative and priority expenses be provided for and paid in a chapter 13. See, e.g., 11 U.S.C. § 1322(a)(2).

Against this universe of claims and legal requirements, and given the sizeable equity the Debtor and her husband have in the residence, the Chapter 13 Trustee has calculated that from the outset of this case the Debtor was required to fund a chapter 13 plan in the amount of $12,324 per month for sixty months in order to retain the $1.385 million home and pay creditors. See *Chapter 13 Trustee's Status Report* (the "Trustee's Status Report,") ECF No. 126, at ¶ 4.

However, the record in this case reflects that the Debtor's proposed chapter 13 plans, including the most recent Amended Plan, never came close to proposing to pay that amount.  In fact, the Court's calculation is that as of September 12, 2023, the Debtor was in arrears of approximately $105,664 from what her true cumulative plan funding requirement should be.

By way of further explanation, this *Memorandum Opinion* is being issued at the conclusion of month 18 (September 2023) of the Debtor's case.  Had the Debtor adequately provided for creditors and paid what is required under the Bankruptcy Code, she would have remitted eighteen monthly payments of $12,324 to the Chapter 13 Trustee.  This base sum equals $221,832 (or 18 x $12,324).

The Chapter 13 Trustee, however, reports that as of September 12, 2023, the Debtor had remitted $116,168 over the past 18 months, thus leaving a shortfall of $105,664 (or $221,832 - $116,168). See Trustee's Status Report at ¶ 5.

A tabular summary of the funding history and shortfall is set forth below:

| Plan Month | Required Payment | Cumulative Payment Requirement | Actual Payment Made | Cumulative Payments | Cumulative Payments Shortfall |
|---|---|---|---|---|---|
| 1 | $12,324 | $12,234 | $0 | $0 | $12,234 |
| 2 | $12,324 | $24,468 | $0 | $0 | $24,468 |
| 3 | $12,324 | $36,972 | $7,000 | $7,000 | $29,972 |
| 4 | $12,324 | $49,296 | $0 | $7,000 | $42,296 |
| 5 | $12,324 | $61,620 | $16,992 | $23,992 | $37,628 |
| 6 | $12,324 | $73,944 | $0 | $23,992 | $49,952 |
| 7 | $12,324 | $86,268 | $6,000 | $29,992 | $56,276 |
| 8 | $12,324 | $98,592 | $29,976 | $59,968 | $38,624 |
| 9 | $12,324 | $110,916 | $0 | $59,968 | $50,948 |
| 10 | $12,324 | $123,240 | $0 | $59,968 | $63,272 |
| 11 | $12,324 | $135,564 | $0 | $59,968 | $75,596 |
| 12 | $12,324 | $147,888 | $9,992 | $69,960 | $77,928 |
| 13 | $12,324 | $160,212 | $9,990 | $79,950 | $80,262 |
| 14 | $12,324 | $172,536 | $16,234 | $96,184 | $76,352 |
| 15 | $12,324 | $184,860 | $9,992 | $106,176 | $78,684 |
| 16 | $12,324 | $197,184 | $0 | $106,176 | $91,008 |
| 17 | $12,324 | $209,508 | $9,992 | $116,168 | $93,340 |
| 18 | $12,324 | $221,832 | $0 | $116,168 | $105,664 |

Demonstrative of the growth of the Debtor's shortfall is this chart:



The ever-growing shortfall with respect to plan funding in this case is

further exemplified by this graph:



As this data reflects, the chasm between what the Debtor has paid, and what she is required to pay, is only growing as this case progresses. According to the Trustee's Status Report, it is estimated that the Debtor's monthly plan payment will need to be increased to $14,613 effective in month 18 (September 2023) given the magnitude of the Debtor's delinquencies. See Trustee's Status Report at ¶ 3. This increase is not reflective in the above analysis, and only exacerbates the Debtor's inability to fund and complete a chapter 13 plan.

**A.**

The record reflects that the Debtor has underfunded this case for two reasons. One, with the assistance of her husband, she crafted a plan with payment amounts which grossly understate exactly what she is required to remit in order to complete her obligations under chapter 13. Two, recognizing that there is a hole in plan funding, the Debtor and her husband simply promised to fill it with proceeds of phantom sales that never materialized for the benefit of this estate's creditors.

For example, in her first chapter 13 plan, the Debtor chose to "not in-clude" mortgage arrears in the plan and grossly underestimated her secured and unsecured tax liabilities. *Chapter 13 Plan Dated April 4, 2022*, ECF No. 14, ¶¶ 3.1 & 3.6.  The net result of these omissions was that the initial proposed plan payment had no relation to reality and was only $4,830 per month (or a little over one-third of what was required to make this case work). Id at ¶2.1.[10]

An initial excuse for the short-pay of the Debtor's true obligations in this case was that the Debtor desired to pursue a mortgage modification (and oth-erwise lower her financial obligations) with Community Bank through the Court's Loss Mitigation Program. See *Motion for Late Entry Into Loss Mitigation Program*, ECF No. 44.

However, the Debtor failed to timely provide the paperwork necessary to participate in the loss mitigation program and Community Bank opposed mort-gage modification for various reasons, including the substantial value of the collateral and Mr. & Mrs. Mazzei's history of delay and payment defaults. See *Objection to Debtor's Request for Late Entry Into Loss Mitigation Program*, ECF No. 50; Transcript of Hearing Held on September 28, 2022 (the "Sept. 28 Tr.") at 3, ECF No. 111.[11]

---

[10] As this case lingered, the Debtor gradually increased her plan payment to essentially fore-stall a day of reckoning in the form of either dismissal or relief from stay or both.  For exam-ple, the record reflects that the Debtor increased her payment from $4,830 per month to $6,249 per month (see Order dated June 8, 2022, ECF No. 25); then she increased her pay-ment from $6,249 per month to $7,000 per month (see Community Bank Ex. 15 and *Debtors' Response to Motion for Relief From Automatic Stay,* ECF No. 42, ¶¶ 19-26 & Ex. (ECF No. 42-2)); and finally she increased it to $9,025 in the Amended Plan on April 7, 2023 (see ECF No. 88).  All of these step increases remain woefully short of what is required.

[11] In Batac v. Boyajian, 532 B.R. 440 (D.R.I. 2015), the court held that failure to submit prop-er documentation is an appropriate reason for the bankruptcy court to deny a debtor an op-portunity to participate in the court's loss mitigation program.  The court also held that a chapter 13 plan cannot be confirmed when the plan is dependent upon a loan modification that was not possible (or a loss mitigation process that had terminated) because such a plan is not feasible. Batac, 532 B.R. at 446-47.

Not to be lost in this record is the fact that the Debtor is statutorily pre-cluded from forcing a lender to modify its mortgage against the Debtor's princi-pal residence by operation of 11 U.S.C. § 1322(b)(2), and this legal conclusion has been upheld by the United States Supreme Court in <u>Nobelman v. American Savings Bank</u>, 508 U.S. 324 (1993).[12]

Moreover, the Debtor and her husband conveniently failed to acknowledge in these proceedings that they previously had plenty of opportuni-ties to negotiate a workout (or mortgage modification) with Community Bank in the state court foreclosure "diversion" program as far back as year 2017, but were unsuccessful.  <u>See</u> Community Bank Ex. 21;[13] <u>see also</u> Transcript of Evi-dentiary Hearing Held April 27, 2023 (the "<u>April 27 Tr.</u>"), ECF No. 130 at 99-102.

Ultimately, the Debtor (with the assistance and encouragement of her husband) abandoned mortgage loss mitigation in this Court after frittering with the process for about a year, and decided to pursue a different bankruptcy strategy. <u>See</u> *Motion to Withdraw the Motion for Late Entry Into Loss Mitigation Program at Docket Number 44*, ECF No. 91.

That is, Mrs. Mazzei now proposes an Amended Plan to pay creditors and cure mortgage arrears with, among other sources, monies she hopes her hus-band will pay if he sells certain real estate he owns individually (which are not part of this bankruptcy estate). ECF No. 88; <u>see also</u> 11 U.S.C. § 1322(b)(8), which allows a chapter 13 plan to "provide for the payment of all or part of a claim . . . from property of the estate or property of the debtor;" and <u>In re New-</u>

---

[12] Parenthetically, a debtor in chapter 7 is precluded from stripping down the lien of a mort-gagee in an effort to force redemption of the collateral at a discount. <u>See</u> <u>Dewsnup v. Timm</u>, 502 U.S. 410, 417 (1992).

[13] "Community Bank Ex.#" refers to the exhibits offered by Community Bank, and admitted by the Court, at the April 27, 2023 evidentiary hearing.

ton, 161 B.R. 207, 217 (Bankr. D. Minn. 1993)(section 1322(b)(8) of the Bankruptcy Code "contemplates sale proceeds as a source of payment").

Community Bank contends that the sales referenced by the Debtor are illusory, speculative, and are another example of bad faith delay.  Here, the record bears fruit supporting Community Bank.

The fact is the instant bankruptcy case is not the first time Mr. Mazzei's individually owned property was "promised" to be sold to pay creditors (including Community Bank).  There is an extensive history of promises such as these, and this history reflects that property was either sold and proceeds not remitted to Community Bank and/or sales never occurred.

For example, property located at 221–223 Chestnut Street, Meadville, PA was promised for sale in Jason Mazzei's confirmed chapter 11 plan to satisfy arrearages due Community Bank and others. See Community Bank Ex. 17 (*Jason J. Mazzei's Amended Plan of Reorganization Dated July 25, 2018* at § 3.01, p. 7).  The sale closed April 26, 2019, just two months after the entry of the final decree in his chapter 11 case.  No accounting of the net proceeds of the sale after payment of taxes and closing costs was ever made (other than a generic statement in response to a discovery request that "$73,883 [was] paid to owner, proceeds used to pay [unspecified] creditors"), and Community Bank never received any proceeds. See April 27 Tr. at 108-120; Community Bank's Ex. 19 (*Plaintiffs' Responses to Defendant Community Bank's First Set of* Interrogatories at response to interrogatory 8).

Another property located at 100 Walnut St., Johnstown, PA was promised in Jason Mazzei's chapter 11 plan for the payment of creditors. This sale closed April 19, 2019, exactly two months after the entry of the final decree in his chapter 11 case.  Similar to the Chestnut Street property, no accounting of the net proceeds of the sale after payment of taxes and closing costs was ever

made (other than a statement admitting that $13,148.56 in proceeds was paid to counsel to Mr. Mazzei), and Community Bank never received any proceeds. Id.

Similarly, from and after confirmation of his chapter 11 plan, Jason Mazzei sold other properties, including 119 Wood Street, Wilkes Barre, PA; 240 Republic Street, Pittsburgh, PA; and 1040 3rd Avenue, Duncansville, PA.

Proceeds of the sale of 119 Wood Street included $11,760.92 which were paid to counsel to Mr. Mazzei, and Community Bank received none of them. Id. Likewise, 240 Republic Street yielded $63,039.21 in net proceeds after payment of tax liens and closing costs, and the net proceeds were then used by Mr. Mazzei to purchase a convertible Mazda Miata automobile and to "pay creditors" which have been unidentified. Of course, consistent with this pattern, Community Bank received none of these proceeds as well. Id. With respect to property located at 1040 3rd Avenue, the property was sold and $35,673 was paid to Mr. Mazzei's counsel with nothing paid to Community Bank. See April 27 Tr. at 117.

Again, all of this occurred while Mr. & Mrs. Mazzei were in default of their payment obligations to creditors—including Community Bank.

The Court also notes that when Mr. and Mrs. Mazzei attempted to address the specifics and propriety of sales that Mr. Mazzei conducted after his chapter 11, the Debtor and Mr. Mazzei either denied knowledge of them or denied responsibility and squarely put blame on Mr. Mazzei's chapter 11 trustee. See Pre-Trial Brief, ECF No. 92 at 2.

The facts are, however, that the assets of Mr. Mazzei's chapter 11 estate reverted back to Mr. Mazzei upon plan confirmation and he was no longer under the tutelage of a chapter 11 trustee. See April 27 Tr. at 140-42; see also 11

U.S.C. § 1141(b)(confirmation of a plan vests all property of the estate in the debtor).  Therefore, Mr. Mazzei does bear responsibility.

3610 Cherry Street, Erie PA[14] is also a property promised in Jason Mazzei's chapter 11 plan for creditors but no transaction ever closed.  In this case by Susan Mazzei, 3610 Cherry Street has again been offered for plan funding.  However, no sale has come to fruition (even though this bankruptcy case has been pending for more than a year and a half).  The same holds true for property located at 416 East Second Ave, Tarentum, PA.  It was promised for sale in Jason Mazzei's chapter 11 case (though not specifically for the benefit of Community Bank), yet never sold.  Then Susan Mazzei promised it to be sold for plan funding, and, again, no sale has ever occurred.

In addition, Mr. and Mrs. Mazzei represented that they were actively working on selling certain property located on O'Neill Blvd, White Oak, PA.  The record, however, indicates that the sale of this property has had the same outcome as both 3610 Cherry Street and 416 East Second Avenue—i.e., no sale in prospect.

For at least two properties referenced above (3610 Cherry Street and 416 East Second Avenue), Mr. & Mrs Mazzei represented to the Court that they had buyers in place, but have made excuses why the deal(s) have not closed. See, e.g., Amended Plan at ¶ 9.1 (representing that real property will be sold and arrears on mortgages cured "within 45 days or sooner"); *Status Report*, ECF No. 93 at ¶ 3 (committing to pay arrears through completion of sales by May 5, 2023); *Documentary Proof of Funds Regarding May 5 Sale*, ECF No. 95 (representing that buyer had cash on hand to close on sale of Erie property before

---

[14] Portions of Jason' Mazzei's confirmed chapter 11 plan referred to this property as "3510 Cherry Street," but his schedules in the chapter 11 case show the property's address is "3610 Cherry Street, Erie, PA."  The Court, therefore, assumes that the address is 3610 Cherry Street.

May 5, 2023); April 27 Tr. at 96-98 (stating that sales will cure arrears, and testifying that buyer has submitted proof of funding); April 27 Tr. at 129-36 (testifying about sales in prospect, yet also testifying that closing dates have been extended); Transcript of July 11, 2023 Hearing ("July 11 Tr."), ECF No. 121 at 5-6 (counsel for the Debtor explaining why closings on sale of real property had not been completed as of July of 2023); see also Audio of September 13, 2023 Hearing at 10:03:55-10:08:15[15] (where counsel to the Debtor acknowledged that the "financing did not go through, the alternative financing did not go through. The property is listed, there is nothing that is pending with regard to the sale of the property").

The excuses for not closing include: repairs needed to be made to the properties, tax liens were filed against the properties thereby clogging title, changes were demanded in regards to the nature or type of appraisal needed for the buyer(s) to qualify for a mortgage to consummate a sale; and a buyer was rejected by his or her lender and/or otherwise financing fell through for the contemplated transaction.

A fair description of what has transpired is that: (1) there have been many excuses for extending the closing deadlines for the offered sales; (2) there has been a steady decline in amount of potential sales proceeds available for this bankruptcy estate's creditors due to, *inter alia*, the placing of tax liens on the properties offered for sale; and (3) where there has been an explanation or justification regarding these moving targets, such excuses have made little sense to the trained eye. See, e.g., July 11 Tr. at 7 (where, in the context of a sale delay due to underwriting issues, counsel for the Debtor acknowledged: "it

---

[15] The timestamp of the September 13, 2023 hearing reflects the time of day and not the duration of the hearing. For example, this timestamp indicates that the statements were made beginning at 10:03:55 a.m. and not beginning at approximately 10 minutes into the hearing.

didn't make sense to me"); Audio of September 13, 2023 Hearing at 10:03:55-10:08:15 (where counsel to the Debtor acknowledged buyer "financing did not go through," "there is nothing that is pending with regard to the sale," and that even if a sale would come to fruition, "payment [for creditors] is not [going to be] anywhere near what we anticipated because of the IRS tax lien").

To put it succinctly, Mr. & Mrs. Mazzei have represented on numerous occasions that the sales necessary to fund the Amended Plan are just around the corner.  However, it appears that the sales promised by the Debtor have evaporated like a rain drop landing on hot pavement.

At the September 13, 2023 hearing on these matters, counsel for the Debtor acknowledged that there are no sales currently in progress to fund the Debtor's Amended Plan (and otherwise cure the substantial arrearages due Community Bank and First Commonwealth Bank).

This undeniable record supports rejecting the Amended Plan as it is simply a "high hope and pipe dream" plan.  The Court reaches this conclusion because 11 U.S.C. § 1325(a)(6) requires that a chapter 13 plan based on speculative sales not be approved.  This conclusion is particularly acute when the Debtor has had ample time to complete the proposed sales and failed. See In re Hogue, 78 B.R. 867, 872-75 (Bankr. S.D. Ohio 1987); see also In re Asken, No. 05-20092REF, 2007 WL 1056724, at *3-*4 (Bankr. E.D. Pa. April 3, 2007)(plan predicated on speculative refinancing is unconfirmable).

**B.**

In chapter 13, a debtor "meets her burden of demonstrating the viability of a chapter 13 plan based upon future income by showing a stable employment history, present employment, and a current net monthly income level sufficient to make proposed plan payments." In re Foley, No. 07-16433BF, 2008 WL 5411070, at *7 (Bankr. E.D. Pa. Oct. 2, 2008)(citing In re Nottingham, 228

B.R. 316, 321 (Bankr. M.D. Fla. 1998)). A failure to show that the chapter 13 debtor will likely have sufficient income to fund her proposed plan will doom confirmation of a chapter 13 plan. Id.

These standards of feasibility are well known to both counsel to the Debtor and Mr. Mazzei (who himself is a former bankruptcy lawyer who filed many chapter 13 bankruptcy cases in this District).[16]

The record made in this case demonstrates that the Debtor (with the substantial assistance of her husband)[17] overstated her net income to obfuscate the fact that this case is not feasible. It further appears to the Court that this mirage of feasibility was done by the Debtor and her husband to keep this bankruptcy case open for the benefit of the automatic stay, thereby further delaying Community Bank's foreclosure efforts. See 11 U.S.C. §§ 362(a)(identifying what actions against the debtor are stayed) and 1301 (identifying that certain actions against co-debtors not in bankruptcy are stayed).

The record reflects that Mrs. Mazzei filed with the Court various schedules of assets and liabilities under penalty of perjury. In Mrs. Mazzei's original Schedule I, she described her monthly income as being $37,333.00—consisting of $35,333.00 in business income plus $2,000.00 of unidentified "contributions." See Schedule I, ECF No. 12, at ECF pp. 24-25.

As the bankruptcy case muddled along, it became apparent to the Court that the Debtor has no real business enterprise of her own (because the business is her husband's only). See Sept. 28 Tr. at 15 (counsel acknowledging that

---

[16] See In re Matters Involving the Professional Misconduct of Jason J. Mazzei, Misc. Pro. No. 14-00205-GLT, 2015 WL 4055475, at *1 (Bankr. W.D. Pa. July 1, 2015).

[17] At the April 27, 2023 trial, Mrs. Mazzei testified that she was "not sure" if the business income set forth in her schedules is accurate. April 27 Tr. at 82. When asked further about this, Mrs. Mazzei testified that the business income number was "probably just what he [Mr. Mazzei] decided it was." Id. at 83.

Mrs. Mazzei "is not really paid on the books" and that Mr. Mazzei "earns all the money");[18] April 27 Tr. at 34-47, 62, 76, and 79 (the Debtor testifying that the income comes from her husband); *Affidavit of Income*, ECF No. 13 at ¶ 1 (Mrs. Mazzei representing that she is "employed by [her] spouse" and "utilize[s] a portion of the income [Mr. Mazzei] receives for [her] needs[,]" yet averring that Mrs. Mazzei is "completely dependent on [Mr. Mazzei]"); April 27 Tr. at 87-89 (Mr. Mazzei is the sole owner of the business Keystone Real Estate).

Given Mrs. Mazzei's lack of her own regular income, and because her husband had filed nothing evidencing that he had the capacity and willingness to fund Mrs. Mazzei's plan, the Court raised its concerns at the September 28, 2022 hearing regarding the Debtor's eligibility to be a chapter 13 debtor. See 11 U.S.C. § 109(e)(setting forth eligibility requirements); see also Sept. 28 Tr. at 14-17.

After this hearing, Mrs. Mazzei amended her *Schedule I* to reflect new-found monthly gross wages from her husband's business: Keystone Real Estate. See Amended Schedule I, ECF No. 65; see also April 27 Tr. at 36–38. This Amended Schedule I purported to increase her take home monthly income by an additional $2,166.66 without any meaningful or credible explanation, thus giving her a stated monthly income of $39,499.66.

This belated amendment to add income under the Debtor's name appears to be nothing but putting numbers on a piece of paper when they do not reflect reality. In fact, the Debtor's testimony at trial belies the existence of any real employment by Mrs. Mazzei and reveals that all the money she receives comes from voluntary payments by her husband, Mr. Jason Mazzei. See April 27 Tr. at 78–86.

---

[18] Mr. Mazzei testified that he gives Mrs. Mazzei "half the money that our office makes." April 27 Tr. at 90.

Obviously, the willingness and capability of Mr. Mazzei to timely and fully fund the Debtor's plan on a regular basis is subject to question. The record supports this observation because Mr. Mazzei himself has a history of failing to remit full and timely payments to creditors both outside of bankruptcy and in it.

Accordingly, the weight of the evidence casts doubt as to (1) whether Mr. Mazzei's income is "sufficiently regular and stable" to support the Debtor's plan, (2) whether Mr. Mazzei has a genuine willingness to support the Debtor's plan; and (3) whether Mr. Mazzei truly has the commitment level and stead-fastness to honor the Debtor's plan obligations. See, e.g. In re Bottelberghe, 253 B.R. 256, 260-61 (Bankr. D. Minn. 2000)(collecting cases)(a sufficiently firm willingness or commitment on the part of non-debtor spouse, coupled with non-debtor spouse's demonstration of feasibility, satisfies "individual with regular" income requirement for debtor eligibility in chapter 13).

Even if the Debtor is deemed to have regular income, the Debtor's income numbers simply do not pass scrutiny in light of the IRS Form 1040 federal in-come tax returns that were admitted into evidence at trial. See Community Bank Ex. 10 (2017 IRS return), Ex. 11 (2018 IRS return), Ex. 12 (2019 IRS re-turn), Ex. 13 (2020 IRS return), and Ex.14 (2021 IRS return).

The Court references the Mazzeis' tax returns because courts have held "if a chapter 13 debtor is self-employed, *__the feasibility of his/her proposed plan will be based upon his/her earning's history (preferably demon-strated by federal tax returns)__*, his/or current income and the likely stability of that income in the future." In re Soppick, 516 B.R. 733, 749 (Bankr. E.D. Pa. 2014)(emphasis and italics added); see also In re Powell, Case No. 4:22-00953-MJC, 2022 WL 10189109, at *6 (Bankr. M.D.Pa. Oct. 14, 2022)(finding debtor's

plan unfeasible and income numbers unreliable because, among other things, debtor failed to submit tax returns to corroborate asserted income).

The IRS tax returns admitted into evidence reflect that the Debtor and her husband had the following adjusted gross income during the years 2017 through 2021:

| Year | Gross Personal Income | Source |
|------|----------------------|--------|
| 2017 | $ 77,501 | 2017 IRS 1040, Line 37 |
| 2018 | $ 52,205 | 2018 IRS 1040, Line 7 |
| 2019 | $109,180 | 2019 IRS 1040, Line 8b |
| 2020 | $135,346 | 2020 IRS 1040, Line 11 |
| 2021 | $249,825 | 2021 IRS 1040, Line 11 |

These IRS 1040 income calculations certainly do not match what is averred in Mrs. Mazzei's original *Schedule I* or Amended Schedule I. Dividing the Mazzeis' adjusted gross income as reported to the IRS by twelve (to get a monthly gross income amount for the Debtor and her husband), and then comparing this number to what the Debtor represented in Amended Schedule I, reveals material discrepancies.  These discrepancies are summarized below:

| Year | Monthly Gross Income Per IRS Tax Returns (x) | Difference From Amended Income of $39,449.66 (y) (x) − (y) = difference |
|------|------|------|
| 2017 | $ 6,458.42 | ($32,991.24) |
| 2018 | $ 4,350.42 | ($35,099.24) |
| 2019 | $ 9,098.33 | ($30,351.33) |
| 2020 | $11,278.83 | ($28,170.83) |
| 2021 | $20,818.75 | ($18,630.91) |

These are significant differences.  When pressed about them at trial, Mrs. Mazzei testified that the income amounts in the schedules were provided by Mr. Mazzei. See April 27 Tr. at 82-83.

Mr. Mazzei testified too. He was defensive and contended that the income numbers in the bankruptcy schedules were accurate because they were based upon his calculation of <u>gross</u> income for his business interests, and not <u>net</u> business income. <u>See</u> April 27 Tr. at 142-47.[19] The testimony of Mr. Mazzei is not persuasive for several reasons.

First, Mr. Mazzei misrepresents what monthly income information a debtor is to report on *Schedule I*. To put it succinctly, *Schedule I* requires individuals to report both "gross wages" and "net income from rental property and from operating a business." <u>Compare</u>, *Schedule I*, line 2 <u>with</u> *Schedule I*, line 8a.

*Schedule I*, line 8a even further mandates that the debtor "[a]ttach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly ***net income***" (emphasis and italics added). And, the Court would note that Mrs. Mazzei did not even attach this required statement to her schedules.

Of course, the weight of the evidence is that, for the most part, Mrs. Mazzei actually had no "gross wages" and, at-most, only "income from rental of property and from operating a business," and thus her *Schedule I* disclosures required her to report <u>net</u> business income and not an inflated gross amount. <u>See</u> <u>In re Weixel</u>, 494 B.R. 895, 898 n.2 (B.A.P. 6th Cir. 2013)(where the court observed in that case that monthly business income should be scheduled on a net basis).

---

[19] The ultimate effect or result of Mr. Mazzei's math is to inflate the overall income calculations of Mr. & Mrs. Mazzei in this bankruptcy. Moreover, the Court notes that if the amount listed on Debtor's *Schedule I* and subsequent Amended Schedule I as "Net income" from operating a business ($35,333) is truly the monthly gross income of the business, and the Debtor purports to receive monthly wages from that business of $2,657.37 as indicated on her Amended Schedule I, then—even if she is truly receiving those wages—the Debtor is still double-counting those funds. First, in the gross business income and then second, as wages received out of the gross income.

Second, the record reflects that the IRS 1040 tax returns do take into consideration net business income when they calculate an individual taxpayer's adjusted gross income, and therefore these tax returns are a more reliable indicator of the Mazzeis' household income. <u>See</u>, <u>e.g.</u>, IRS Form 1040, and <u>compare</u> with IRS Form Schedule 1 and Schedule C (found at Community Bank Ex. 13).

Mr. Mazzei's testimony, at best, demonstrates that he had a reckless disregard for the accuracy of information required for Mrs. Mazzei's bankruptcy schedules, because, again, question 8a of *Schedule I* clearly and unequivocally demands that the Debtor identify all expected monthly "net business income" of both the debtor and the debtor's spouse (and does not ask for "gross business income").

Conversely, worst case scenario, Mr. Mazzei's testimony supports the conclusion that the income disclosures in *Schedule I* and Amended Schedule I are intentionally misleading in light of the Mazzei's prior reporting of income to the IRS.

Given Mr. Mazzei's demeanor on the stand, and his extensive knowledge and experience in bankruptcy, this Court concludes that the income statements filed by the Debtor (with information supplied by Mr. Mazzei) at *Schedule I* and Amended Schedule I intentionally overstate the Mazzeis' income and are misleading to suggest that the Debtor can fund a plan (when she really cannot). This Court's observations and conclusions are further reinforced by the fact that the Debtor's payment history in this case is riddled with shortfalls. Moreover, what the Debtor has paid in this case is nowhere close to the disposable income the Debtor reported in her self-serving bankruptcy schedules. <u>Compare</u> Amended Schedule I (ECF No. 65) and *Schedule J* (ECF No. 12, at ECF pp. 26-27) <u>with</u> Trustee's Status Report at ¶ 5.

For instance, the Debtor's schedules aver that the Debtor's monthly income is $39,499.66 and her monthly expenses are $22,120. <u>Compare</u> Amended Schedule I at line 12, <u>with</u> *Schedule J* at line 22. These averments therefore represent that the Debtor has monthly disposable income of $17,379.66 (i.e., $39,499.66 - $22,120).

The Debtor, however, as of the September 12, 2023 Trustee's Status Report was in month 18 of this case and had remitted an aggregate of $116,168 in plan payments to the Chapter 13 Trustee—which averages $6,453.78 per month. This average is substantially below the Debtor's representation of disposable income as set forth in the Debtor's schedules. This obvious disparity and poor payment record leads to the inescapable conclusion that the documents filed by the Debtor are false and misleading.[20]

The impact of misleading statements about monthly income in bankruptcy schedules can be seen in the Trustee's Status Report filed by the Chapter 13 Trustee. In paragraph 6 of this document, the Chapter 13 Trustee states "[B]ased on the amended Schedule I, and using the expenses from original Schedule J, it appears net income is, on average, in excess of $17,000 per month which should have been sufficient to fund the current amended plan." ECF No. 126 at ¶ 6. What is telling by this averment is that the income disclosures filed by a debtor are important; they can lull creditors and the Chapter 13 Trustee into thinking that a chapter 13 plan is feasible when it is not.

---

[20] If one is to accept Mr. Mazzei's testimony, the alternative conclusion is that the Debtor is providing her least efforts to pay creditors in this bankruptcy case when the Bankruptcy Code's requirement of good faith mandates that she provide her best efforts. <u>See</u>, <u>e.g.</u>, <u>Kitchens v. Ga. R.R. Bank & Tr. Co. (In re Kitchens)</u>, 702 F.2d 885, 888 (11th Cir. 1983)(good faith requires that debtors provide their best efforts); <u>see also</u> 11 U.S.C. § 1325(a)(3)(requiring that a chapter 13 plan be proposed in good faith). The Court notes that subsequent to the decision in <u>Kitchens</u>, 11 U.S.C. § 1325(b) was amended by Congress in 2005. These amendments added the means test to chapter 13. These amendments did not overrule the good faith/best efforts analysis set forth in <u>Kitchens</u>. <u>See</u>, <u>e.g.</u>, <u>In re Shelton</u>, 370 B.R. 861, 866-69 (Bankr. N.D. Ga. 2009).

The true state of affairs for Mrs. Mazzei is that payments on her behalf have been irregular at best, and most certainly inadequate to support the Debtor's obligations under chapter 13.

For purpose of completeness, the Court notes that some of the plan payments made on behalf of the Debtor have exceeded the average of $6,453.78 per month.  However, those higher payments fall short on an aggregate basis from what is legally required and were only made by or on behalf of the Debtor after she had a history of non-payment or under-payment in this case, and after the Debtor and her husband were pressured by either Community Bank's motion, the Chapter 13 Trustee's requests, or by order of the Court to do so.

The circumstances present are that the Debtor's funding gap in this case continues to grow, and the Debtor and her husband's actual earnings fail to demonstrate that they can dig out of this hole.

The Chapter 13 Trustee calculates that the Debtor's chapter 13 plan payment needs to be immediately adjusted upward to $14,613 per month (effective September 2023) given the extensive plan payment shortages that have accrued.  The record, though, reflects that the Debtors will need much more income than that to pay these chapter 13 plan payments and at the same time fund other household expenses.

*Schedule J* filed by the Debtor reflects an additional $18,620[21] in household expenses are incurred by Mr. & Mrs. Mazzei each month that are not included in her plan payment.  See *Schedule J*, ECF No. 12 at ECF pp. 26-27.

These expenses, when added to the required plan payment of $14,613, yields $33,233 in monthly obligations.

The evidence is substantial that the Mazzeis cannot fund these obligations given their record of payment defaults that span four bankruptcy cases over seven years, and given their history of earnings as reported to the IRS (that reflect an average adjusted gross income ranging from as low as $6,458.42 per month and as high as $20,818.75 per month).

Of course, the analysis above does not even address the admissions made by Mrs. Mazzei in her *Official Form 122C-2*, where she calculates her current income as being $15,233 per month (out of which $6,381.16 per month is projected disposable income available to fund a plan).  See ECF No. 12 at ECF pp. 40-46.  These admissions are consistent with the Court's conclusion that the Debtor does not have sufficient income to both fund her plan payment and provide for other household expenses.

This analysis also does not include the fact that the Mazzeis have not adequately accounted for satisfaction of IRS tax liens which remain outstanding. For instance, Mr. Mazzei testified at trial that IRS tax liens should have been included in the Debtor's schedules.  See April 27 Tr. at 131.  However, the IRS is not listed as a creditor in the Debtor's schedules, see Schedules D and E/F,

---

[21] In her *Schedule J*, Mrs. Mazzei identifies the following monthly expenses that do not appear to be included in her Amended Plan: real estate taxes of $1,541, home owners insurance of $466, home maintenance and upkeep costs of $300, utilities of $900, food and housekeeping supplies of $1,000, childcare and education costs of $250, cleaning and laundry expenses of $250, personal care products of $200, medical and dental expenses of $300, transportation expenses (excluding car payments) of $400, entertainment of $200, insurance of $1,213, charitable contributions of $100, mortgages on other property of $3,500, and unspecified taxes of $8,000.

ECF No. 12 at ECF pp. 11-21, and the IRS is not listed in the Debtor's mailing matrix. See *Notice Regarding Filing of Mailing Matrix*, ECF No. 2. Therefore, the IRS never received appropriate notice of the pendency of the Amended Plan or the bar date for filing claims.

Yet, at the same time, Mr. Mazzei and his counsel have acknowledged after-the-fact that the IRS holds substantial liens which remain unsatisfied. See, e.g., July 11 Tr. at 5 (counsel noting that the IRS tax lien "came in higher than anticipated"); July 11 Tr. at 9 (counsel for Community Bank acknowledging that he received a closing statement on behalf of the Mazzeis reflecting a $130,000 IRS tax lien); and Audio Recording of September 13, 2023 Hearing at 10:03:55-10:08:15 (counsel for the Debtor acknowledging an IRS tax lien of approximately $90,000).

Under these circumstances, the preponderance of the evidence is that feasibility is lacking. It is therefore appropriate to deny confirmation of the Amended Plan. See In re Foley, 2008 WL 5411070, at *7 (citing In re Nottingham, 228 B.R. at 321); see also In re Goodwin, No. 07-10442BF, 2007 WL 3256890, at *6 (Bankr. E.D. Pa. Nov. 2, 2007)(self-employed debtor, who had two prior unsuccessful cases and a history of payment delinquency in present case, had chapter 13 plan denied on feasibility grounds when debtor's asserted income was not "corroborated by federal income tax returns"); and In re Powell, 2022 WL 10189109, at *5-*6 (chapter 13 supported by self-serving Schedule I is not feasible and filed not in good faith when successive bankruptcy is filed by debtor with negative income shortly after dismissal of prior bankruptcy).

### C.

Community Bank asserts an additional basis on which confirmation of the Amended Plan may be denied—that is, it alleges that the commencement of

this bankruptcy case and the prosecution of the Amended Plan has not been done in good faith. See 11 U.S.C. §§ 1325(a)(3) and 1325(a)(7).

Throughout these proceedings, Community Bank has made a number of allegations regarding the conduct of the Debtor and her husband.  The gist of the allegations, as set forth in the Court's January 20, 2023 Rule to Show Cause, is that "the Debtor has been playing fast and loose [with the bankruptcy process], that this case has meandered here with no realistic probability [of success], [ . . . and that] the creditors have suffered prejudice and delay by what has transpired." See Rule to Show Cause at 3-4, ECF No. 80.

In addressing the concept of "good faith" in the chapter 13 context, United States Circuit Judge Richard A. Posner wrote:

> … good faith under Chapter 13 depends on the "totality of the circumstances," and we have enumerated a number of those circumstances of which the most fundamental and encompassing is whether the debtor has dealt fairly with his creditors. In re Smith, 848 F.2d 813, 817 (7th Cir. 1988); In re Rimgale, 669 F.2d 426, 432-33 (7th Cir. 1982).  Is he really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them? "[A] sincere effort at repayment" is a sine qua non of good faith. In re Caldwell, 895 F.2d 1123, 1126 (6th Cir. 1990).

In re Schaitz, 913 F.2d 452, 453-54 (7th Cir. 1990).

While the United States Court of Appeals for the Third Circuit has not directly addressed the "good faith" requirement under § 1325(a)(3), bankruptcy courts within this Circuit employ the same analysis used for determining whether the chapter 13 bankruptcy case itself has generally been filed and prosecuted in good faith. See, e.g., McKinney v. McKinney (In re McKinney), 507 B.R. 534, 551-52 (Bankr. W.D. Pa. 2014).

That is, this Court looks to the "totality of the circumstances" to determine lack of good faith, and may consider a wide range of factors, including,

> the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Myers, 491 F.3d 120, 125 (3d Cir. 2007)(quoting In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996)).

> In addition, lack of good faith may also be present when:

> a debtor is not forthcoming with the bankruptcy court and with creditors.  A debtor is obligated to provide full disclosure of his or her financial affairs, including a complete and accurate list of assets and liabilities. Marrama v. Citizens Bank (In re Marrama), 430 F.3d 474, 478 (1st Cir. 2005), aff'd, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007)("Those who seek the shelter of the bankruptcy court [must] not play fast and loose with their assets or with the reality of their affairs."(quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987); In re Dixon, Bankr. No. 08:10510DWS, 2009 WL 151688, *2 (Bankr. E.D. Pa. Jan. 20, 2009) aff'd Civ. A. No. 09-1451, 2009 WL 1798819 (E.D. Pa. June 24, 2009)(holding that debtors have strict obligation to provide full and accurate information regarding their financial condition); cf. In re Leavitt, 171 F.3d 1219, 1225 (9th Cir. 1999)(upholding dismissal of case where assets not disclosed or undervalued); In re Buchanan, 225 B.R. 672 (Bankr. D. Minn. 1998), aff'd sub. nom., Buchanan v. U.S., No. 98-2291 (PAM), 1999 WL 314819 (D. Minn. April 2, 1999)(dismissing Chapter 13 case in which debtor failed to disclose numerous assets, undervalued assets, under-reported income and failed to disclose significant liabilities owed to IRS). Therefore, when a debtor undervalues assets, he or she is not being candid with the court or with creditors regarding the debtor's financial affairs. In re Stevens, BHN 008, 2013 WL 5222801, *4 (Bankr. D.N.H. Sept. 17, 2013)(holding that intentional undervaluation of an asset may constitute bad faith).

G6 Hosp. Franchising LLC v. Zaver (In re Zaver), 520 B.R. 159, 165 (Bankr. M.D. Pa. 2014).

Having undertaken a close examination of the record, the Court finds that there are plenty of *indicia* reflecting that both this chapter 13 case and the Amended Plan have not been filed and prosecuted by the Debtor in good faith. These *indicia* include the fact that the Debtor (with the assistance and encouragement of her husband) has not made a sincere effort at repaying her creditors.

It appears to the Court that this fourth bankruptcy filing is nothing but an effort by Mr. & Mrs. Mazzei to obtain the protection of the automatic stay in bankruptcy and forestall their creditors without regard to whether creditor claims actually get satisfied or paid.  It also appears that Jason Mazzei is the decision maker with respect to the Debtor's bankruptcy strategy, and that this case is actually being prosecuted by Jason Mazzei through his wife Susan Mazzei.

The Court comes to this conclusion based on several factors, including Mrs. Mazzei's apparent lack of control over the decision to file for bankruptcy relief, her lack of familiarity with her bankruptcy filings, and, generally, the "tag-team" style in which the bankruptcy filings between husband and wife have occurred since 2016.

The evidence shows that, while this case was filed solely in the name of the Debtor, she is not actually in control of the case. Instead, Mrs. Mazzei appears to have surrendered control of this bankruptcy (and overall finances) to her non-debtor husband.

This conclusion is reflected where Mrs. Mazzei testified that she was "not sure why we did that then[,]" when questioned as to why she filed the instant bankruptcy case while Mr. Mazzei's individual bankruptcy was pending in the District of Maryland. April 27. Tr. at 29-30.

Her testimony also reflected that in addition to not knowing why she filed this current case, she did not make the decision to file her previous case in July 2020. When asked pointedly if it was her idea to file the July 2020 bankruptcy, Ms. Mazzei gave a muddled response, stating that the filing was something "*they*" decided to do, and indicated that the question should be directed to Mr. Mazzei. April 27. Tr. at 30.

Moreover, Mrs. Mazzei does not appear to have a handle on the content of her schedules and other bankruptcy related filings. For example, when asked about the accuracy of the business income listed in her schedules, Mrs. Mazzei testified that she was not sure and that she "really [did not] know." April 27 Tr. 82. When further asked how she came up with the income figure set forth in the schedules, she stated that she "assume[d her] husband came up with the number ... That's probably just what he decided it was." April 27 Tr. 83.

Further expounding on Mrs. Mazzei's lack of clarity with her own schedules, Mrs. Mazzei testified that her initial *Schedule I* was inaccurate in its representation that she had no earned income and that she "[did not] know why they filed it that way." April 27 Tr. 47.[22] Of course, Mrs. Mazzei blames the confusion on the way the accountant prepares the family tax returns—something that Mrs. Mazzei also displays little understanding of or familiarly with. See e.g., April 27 Tr. 41 & 47-48.

Mrs. Mazzei appears to have a limited understanding of her financial condition in general. She testified that she was unsure if her "paychecks" were subject to withholding (April 27 Tr. 48); that she did not know if she had an ownership interest in Keystone Real Estate (she does not) (April 27 Tr. 80–81);

---

[22] In this referenced passage, the transcript refers to "Schedule A" in discussing Mrs. Mazzei's disclosure of income. This appears to be an error as income is disclosed on Schedule I.

that she did not know if county, local, and school district taxes on her residence were paid by her (or her husband) in the prior seven years and whether Community Bank has paid taxes and insurance on the Mazzeis' behalf (April 27 Tr. 58-60); that she did not know how much money had been paid through the bankruptcy trustee to creditors (April 27 Tr. 59); that she was not sure if timely mortgage payments were made to Community Bank (April 27 Tr. 60); and that she was "unfamiliar" with the mortgage foreclosure action filed against her and her husband in Allegheny County (April 27 Tr. 60 & 66).

As to this last point, knowledge of the foreclosure action, her testimony appears to be self-serving and false, as the record reflects that service of the foreclosure action was effectuated on both Mr. & Mrs. Mazzei. See Community Bank Ex. 21 (reflecting service completed on "07/05/2016" at "13:55 [i.e., 1:55 p.m.]."

Moreover, Mrs. Mazzei appears to have little to no knowledge of the specifics of the proposed sales contemplated by her Amended Plan. Instead, Mrs. Mazzei suggested that questions regarding the sales be directed to Mr. Mazzei. April 27 Tr. 52.

All of this suggests that Mrs. Mazzei is just a player in her husband's game of "whack-a-mole" bankruptcy petitions.

Mrs. Mazzei appears to be completely deferential to her husband's plans, and has little understanding or personal objective of completing a rehabilitation under chapter 13. Further strengthening this observation is the timing of the Mazzei's bankruptcy cases—notably each filed individually even though the Mazzeis derive their income from the same business source and are jointly liable on the major obligations identified in this *Memorandum Opinion.*

On this point, the record reflects that the Mazzei's filed their petitions in a tag-team style. From and after Mr. Mazzei defaulted on his chapter 11 plan,

the Mazzei's have timed their bankruptcy petitions to overlap (or nearly overlap) and thus keep Community Bank from completing its foreclosure.

In fact, the Mazzei's staggered their cases; they never filed jointly; and no *bona fide* explanation has been submitted for the "tag-teaming" conducted by these debtors.

The coordinated leap-frogging of bankruptcies kept creditors from ever getting the full picture. It also kept the courts from ever having total jurisdiction over all the property Jason and Susan Mazzei own either as individuals or as joint tenants. On this point, the Court notes that the local rules of this court mandate that when debtors file a bankruptcy case, they are required to file written disclosure of any "related case" by a "spouse or former spouse." See W.PA.LBR 1007-3.

The purpose of this rule is simple, to ensure that the bankruptcy filing gets assigned to the judge who presided over the previous related case. In the instant chapter 13 case, however, and like her prior failed chapter 13 case, Mrs. Mazzei never filed the required disclosure regarding her husband's case. As such, she successfully avoided having her case assigned to Chief Judge Taddonio.

Obviously, the effect of the "tag-team" style of filing bankruptcies by Mr. and Mrs. Mazzei is that they have continuously been in bankruptcy or had the protection of a confirmed chapter 11 plan since December 2016 (with exception of roughly 15 days between the dismissal of the July 2, 2020 and the filing of the September 4, 2020 chapter 13 cases), and have never fulfilled their responsibilities. Despite this span of time which now approximates seven years, there has been no noteworthy progress in the paying down of the debts of creditors—namely, Community Bank.

For instance, the debt to Community Bank originated on September 12, 2003 as a Construction Note in the original amount of $553,400. See Motion for Relief From Stay, ECF No. 32, ¶¶ 4-6. Even though the loan is now twenty years old, and the Debtor and her husband have been a party to four collective bankruptcies, little headway has been made with respect to repayment.

For reference, as of the commencement of this case before the Court, the total debt due Community Bank was $518,495.28. See Claim No. 5. As of the April 27, 2023 trial on Community Bank's Motion for Relief From Stay, the Mazzei's outstanding obligations to Community Bank totaled $500,023.03 (including principal, interest, costs such as advancements on account of forced placed insurance and property taxes, and counsel fees). See Community Bank Ex. 20.

To put the delay and lack of progress into perspective, had the Mazzeis made payment and performed on their loan, Community Bank should be owed approximately $280,000 as of April of 2023 and not $500,023.03—a difference of approximately $220,000. See Community Bank Ex. 17 (amortization table attached to Community Bank's Reply Brief to Debtor's Response to Rule to Show Cause[23]).

To put the delay in another perspective, as of December 30, 2016, which is the date Mr. Mazzei filed his chapter 11 case in front of Chief Judge Taddonio, the portion of the debt due Community Bank on account of principal (i.e., without regard to unpaid interest, fees, and costs) was $441,833 (rounded to the nearest dollar). *Rebuttal to Debtor's Closing Arguments*, ECF No. 109, Ex. 1 at 5. As of the petition date in this case (filed by Mrs. Mazzei), the principal

---

[23] Originally filed at ECF No. 83.

balance has only decreased to $431,241 (rounded to the nearest dollar). Id. at 6.

The table below is a summary as to how the principal balance of Community Bank's claim has floated at roughly the same amount for years, starting with Mr. Mazzei's chapter 11 case in 2016:

| Date | Event | Approx. Principal Balance |
|---|---|---|
| 12/30/2016 | Jason Mazzei files 16-24827-GLT | $441,833 |
| 2/19/2019 | Final Decree entered in 16-24827-GLT | $441,651 |
| 7/2/2020 | Susan Mazzei files 20-22012-TPA | $441,651 |
| 8/20/2020 | 20-22012-TPA dismissed | $443,201 |
| 9/4/2020 | Jason Mazzei files 20-18222-TJC | $443,201 |
| 3/6/2022 | Susan Mazzei files 22-20395-JAD | $431,241 |
| 9/9/2022 | 20-18222-TJC dismissed | $428,957 |

The graph below is a further visual representation of the of the lack of progress the Mazzeis have made on the principal balance due Community Bank at key moments of the Mazzeis' respective bankruptcy cases:



Just from a cursory review of the above, it is clear that there has been little movement in the outstanding principal balance of the Community Bank loan. Why? The answer is simple: because (a) the Mazzeis have filed serial bankruptcies that were not feasible, and (b) in instances when the Mazzeis have funds, they have elected to use them (or divert them) in ways which do not pay down the debt due Community Bank (and others, such as First Commonwealth Bank).

Particularly insightful as to the mindset and goals of the Debtor and her husband is the complete lack of payments on the loan to Community Bank between the entry of the Final Decree in Jason Mazzei's chapter 11 case (16-24827-GLT) on February 19, 2019, and Mr. Mazzei's next bankruptcy case filed in the District of Maryland under chapter 13 on September 4, 2020.

When asked to explain his failure to fulfill his Chapter 11 Plan obligations (which included payment of the contractual monthly payment of

$2,577.64 to Community Bank),[24] Mr. Mazzei blamed a "series of bad luck," namely COVID-19 related restrictions that shuttered businesses throughout the region. April 27 Tr. 93-94.

The Court finds this excuse disingenuous becauseCOVID-19 restrictions were not in place until March 2020 (over a year after the entry of the Final De-cree in Mr. Mazzei's chapter 11). See County of Allegheny v. The Cracked Egg, LLC (In re Cracked Egg, LLC), 624 B.R. 84, 87 (Bankr. W.D. Pa. 2021).

Moreover, the record reflects that the Mazzeis' adjusted gross income ac-tually increased after the COVID-19 shutdowns from $109,180 in adjusted gross income in 2019, to $135,346 in adjusted gross income in 2020, to $249,825 in adjusted gross income in 2021. See Community Bank Exs. 12, 13 and 14.   But, these income amounts were not enough to fund Mr. Mazzei's ob-ligations set forth in both his confirmed chapter 11 and chapter 13 plans, let alone what is legally required by Mrs. Mazzei in the chapter 13 before this Court (which is demonstrative of the facial unfeasibility of their plans).

These facts, paired with the discussion above regarding the Mazzeis' fail-ure to utilize post-Final Decree property sale(s) proceeds to pay down the Community Bank loan balance, strongly suggest that payment of this debt is not a primary objective.[25] Rather, these facts suggest that the sole objective of the Debtors is to retain the Allison Park Property valued at $1.385 million, re-gardless of whether they can afford to do so.

---

[24] See *Amended Chapter 11 Plan of Reorganization* filed at 22-20395-JAD, ECF No. 83-4, 7 ¶ 3.01.

[25] In 2019, shortly after Mr. Mazzei received his final decree in his chapter 11 case, he sold several pieces of real estate and netted upwards of $136,000. See *supra*, part III. A. (discuss-ing the property sales promised in Mr. Mazzei's chapter 11 plan). In her response to interroga-tories, Mrs. Mazzei said the proceeds were used to pay creditors, Community Bank received nothing. Compare April 27 Tr. at 108–120; Community Bank's Ex. 19 (Susan Mazzei's answer to Interrogatory 8) with Community Bank's *Pre-Trial Brief*, ECF No. 89, pp. 5–6.

Even more, the record suggests that the Debtor and her husband are using their bankruptcy filings to shirk their responsibility to utilize their best efforts to satisfy the claims of creditors. As support for this conclusion, one only needs to look at how the arrearage to Community Bank has grown over the years. When Jason Mazzei filed his chapter 11, the arrearage to Community Bank was $27,748.66. See Case No. 16-24827-GLT, Claims Register No. 4-1. When Susan Mazzei filed this most recent chapter 13, the arrearage had grown more than five-fold to $151,868.42. See Case No. 22-20395-JAD, Claims Register No. 5.

The Mazzeis' tax filings provide additional support for this Court's conclusion. For example, in 2019, the Mazzeis' claimed they made a $30,000 gift to an unidentified charity (but supplied no documentation or receipts with their return). See 2019 IRS Form 1040, Schedule A, Line 11. However, Community Bank received no payments during the entirety of tax year 2019. See ECF No. 109-1, 4–6. As such, it appears that Mr. & Mrs. Mazzei willfully chose to not pay Community Bank, and instead paid $30,000 to charity all while Mr. Mazzei was in default on his chapter 11 plan. See April 27 Tr. at 142.

Further bolstering the conclusion that the primary objective of Mr. and Mrs. Mazzei is to delay creditors is the fact that the payments by each of Mr. and Mrs. Mazzei in their respective cases were (and are) lacking and/or have been underfunded.

As noted above, Mr. Mazzei's Chapter 11 Plan failed for lack of payments and he has provided no just cause for this failure (and it appears that the case was simply not feasible).

Additionally, in Mr. Mazzei's Maryland bankruptcy case, dismissal was sought by the Chapter 13 Trustee (and granted) on the averment that Mr. Mazzei was in default of his plan in the amount of $79,625.25, which was ap-

proximately nine months in arrears. See *Mot. to Dismiss Case for Material Default in Plan Payments and Plan Terms,* 20-18222-DER, filed at 22-20395-JAD, ECF No. 83-7 & 83-8.

Notwithstanding these outcomes, Mr. Mazzei encouraged, if not directed, that his wife commence two cases within this District on the heels (or in the midst) of his failed bankruptcies.[26]

This context leads to the inescapable conclusion that Mr. Mazzei (who is the admitted plan funder) could not seriously expect to be able to make full plan payments in this case, when Mr. Mazzei was already in default of his own case(s). The overall objective in these circumstances can only be to delay and to frustrate the collection efforts of Community Bank. See Powell, 2022 WL 10189109, at *6 (chapter 13 filed in bad faith when debtor with negative monthly income filed the bankruptcy case shortly after voluntarily dismissing the previous one).

Additional circumstances surrounding Mrs. Mazzei's cases evidence a "delay, not pay" mindset. In her 2020 bankruptcy case, the Debtor sought three extensions of time to complete her schedules (two of which were granted)—thereby stretching out the duration of her case—before finally having her first chapter 13 case dismissed for failure to complete her filing obligations. Unsurprisingly, she made no payments in that case. See *Order Dismissing Case Without Prejudice and Terminating Wage Attachment,* 20-22012-TPA, ECF No. 23.

In the instant case, Mrs. Mazzei filed her chapter 13 petition on March 6, 2022, and her original chapter 13 plan on April 4, 2022. Thereafter, she dith-

---

[26] In the motion to dismiss filed August 9, 2022, the Maryland Chapter 13 Trustee indicated that Mr. Mazzei was nine months delinquent (i.e., delinquent since December of 2021). Mr. Mazzei was therefore in default of his Maryland Chapter 13 Plan when Susan Mazzei commenced this chapter 13 case on March 6, 2022.

ered in the failed effort to pursue late participation in the Court's Loss Mitiga-
tion Program (which had a zero chance of success). See ECF Nos. 44, 50, and
111.  The net effect of this frolic and detour was that she had about a year of
delay in this case whereby she woefully underfunded her chapter 13 plan.

 Digging deeper into the record of the case, the docket reveals that at the
conclusion of her Meeting of Creditors held on May 9, 2022 pursuant to 11
U.S.C. § 341, the Chapter 13 Trustee requested a contested confirmation hear-
ing with the notation: "[l]ack of payments." ECF No. 21.

The contested confirmation hearing requested by the Chapter 13 Trustee
was set for June 1, 2022.  Magically, at 7:59 a.m. in morning of June 1, 2023,
Mrs. Mazzei filed a *Documentary Proof of Plan Payment* showing payments ag-
gregating $7,000 (exclusive of transaction costs) effective "June 2, 2022." ECF
No. 23.

Thus, the Debtor waited until the proverbial "last-minute" to make her
first payment in this case—an underfunded one at that.  And, this payment
was made well after the April 5, 2022 deadline imposed by the Bankruptcy
Code for the Debtor to commence making plan payments. See 11 U.S.C. §
1326(a)(1).  All of this is a pattern that has continued throughout this case,
along with the promises of sales that evaporated (which is discussed previously
in this *Memorandum Opinion*).

The record further reflects that the Debtor also has not been totally
forthcoming, which is an *indicia* of bad faith. See In re Napier-Lopez, Case No.:
23-10694-ABA, 2023 WL 3260150 (Bankr. D.N.J. May 4, 2023)(discussing im-
portance of disclosure and candor in the context of good faith prosecution of a
chapter 13).

For example, much of this *Memorandum Opinion* has described the Debt-
or's misrepresentations about the income disclosed in *Schedule I* and Amended

-43-

Schedule I, and the Court will not re-hash it here except to incorporate the discussion by reference.

In addition to the disclosure problems associated with *Schedule I*, the record reflects that the Debtor and Mr. Mazzei willfully failed to answer interrogatories about bank accounts, see April 27 Tr. at 57, and willfully failed to answer interrogatories about "all other income" whether "reportable or not for federal income tax purposes." See April 27 Tr. at 57-58. This discovery is relevant, probative, and Mrs. Mazzei had no acceptable excuse for not furnishing the requested information.

The gamesmanship is highlighted by the fact that a few weeks after Mrs. Mazzei's first bankruptcy case was dismissed, Mr. Mazzei filed his own chapter 13 petition in Maryland. The Court wonders why this case was filed in Maryland in the first place. Was it to make it more difficult for a small local bank, such as Community Bank, to protect its interests?

Filing in Maryland had no discernable benefit to Mr. Mazzei (and by extension, Mrs. Mazzei). Certainly, it was not because Maryland bankruptcy courts apply different law to the Mazzeis' property interests than what this Court would—because the law governing property interests is the same regardless in which district a case is commenced. See Butner v. U.S., 440 U.S. 48 (1979) (holding that the law of the state where property is located governs); but see April 27 Tr. 94–96 (Jason Mazzei testifying that he filed in Maryland because its real estate laws were "a little more favorable"). Nor can it be because Maryland's chapter 13 process is different, because there are no material differences between the districts.

Nonetheless, Jason Mazzei filed in a jurisdiction different from where his prior chapter 11 case had been commenced, and in a place different from

where his marital home (and most substantial assets) are located.[27] This forced Community Bank to pursue its interests in Maryland and incur more needless fees doing so.

All during this intervening time, arrears to Community Bank were adding up, and Community Bank was incurring costs to protect its collateral. See April 27 Tr. 169–170 (Community Bank's representative testifying it bought force-placed insurance because it received a "Notice of Cancellation" regarding the Mazzei's insurance policy).[28]

Mr. Mazzei's Maryland case had many of the same deficiencies as this case and failed because Mr. Mazzei did not make his payments. See *Order with Notice Dismissing Chapter 13 Case on Motion of Chapter 13 Trustee for Material Default in Plan Payments after Confirmation and Notice that Automatic Stay is Terminated*, ECF No. 73 on that case's docket.[29]

The failure to make payments continued through to the instant case filed by Mrs. Mazzei (again, her second one), because as set forth above, she did not start making payments when she proposed her initial plan. Trustee's Status Report at ¶ 5. In fact, most of the payments Mrs. Mazzei made in this case were on the eve of a hearing and were "irregular." Id. ¶6.

---

[27]   Mr. Mazzei owned one piece of realty in Maryland, and the Court is not suggesting that the District of Maryland did not have jurisdiction. Rather, the Court is pointing out that Maryland was not a convenient (or logical) forum for a debtor to choose to file a chapter 13 bankruptcy given the universe of assets and universe of claims. See 28 U.S.C. 1412 ("district court may transfer a case . . . to another district, in the interest of justice or for the convenience of the parties").

[28] Although Mr. Mazzei insisted he has always carried insurance on the property (April 27 Tr. 123), the Court finds his testimony to not be credible.  In addition, the undeniable record in this bankruptcy cases is that real estate tax arrearages are ample, which corroborates Community Bank's position that the Mazzei's failed to pay real estate taxes and insurance. See Claim Nos. 8–10.

[29] Case No. 20-18222 in the United States Bankruptcy Court for the District of Maryland. See Community Bank Ex. 5.

The problems associated with irregular payments in this case can be tied to significant questions regarding the Mazzeis' income.  Specifically, an experienced, former bankruptcy lawyer like Mr. Mazzei knows that chapter 13 is only available to individuals with "regular income." Yet, when Mrs. Mazzei filed this case, she had no income. She claimed her husband's income was her "household income." When the Court questioned her eligibility for chapter 13 relief, she quickly amended her schedules and manufactured pay stubs to show she was receiving "regular income" from Keystone Real Estate. See Amended Schedule I, ECF No. 65.

Mrs. Mazzei's testimony, however, is contrary to that amended schedule. She testified that she just "help[s] out with the day-to-day stuff" and has worked "off and on…" April 27 Tr. 9. Someone who helps out "off and on" does not have regular income. Yet, Mrs. Mazzei (at her husband's behest and with his help), filed for chapter 13 relief anyway. April 27 Tr. 82–83 ("I assume my husband came up with the number … That's probably just what he decided it was").

The fact is, Mr. Mazzei is the person behind this bankruptcy case and is the plan funder.  The weight of the record, however, substantiates the conclusion that he has insufficient income to fund what is required to make this case feasible; and that such insufficiency was known by him and his wife at all times material hereto.  Notwithstanding this fact, they did their best to obfuscate the record in hopes of creating the appearance that the case is feasible.

In due consideration of the totality of the circumstances, this chapter 13 bankruptcy case can be summed up in just a few sentences.  Inflated misrepresentations of income, intermittent (yet underfunded) plan payments, and amorphous promises of outside sales by the Debtor's non-debtor spouse to

fund a plan were the winds that kept this "bankruptcy kite" flying—all to the detriment of creditors.

In light of these facts, coupled with the serial filings between husband and spouse and the prosecution of a plan that is facially not feasible, the Court can only conclude one thing. That is, this bankruptcy case and the Amended Plan have not been filed and prosecuted in good faith. These circumstances warrant denial of confirmation of the Amended Plan pursuant to 11 U.S.C. §§ 1325(a)(3) and 1325(a)(7).

## IV.

As mentioned above, Community Bank has filed a Motion for Relief From Stay, whereby it requests that the automatic stay be lifted so that it may complete its state law foreclosure action with respect to the Allison Park Property.

In its Motion for Relief From Stay, Community Bank alleges that the "actions of [Mr. & Mrs. Mazzei] have caused significant delay and frustration to [Community Bank] in its attempt to collect on its debt." See Motion for Relief From Stay at ¶ 31. Community Bank avers that "[t]he Debtor and [Mr. Jason Mazzei] have abused the Court system by filing multiple bankruptcies. The Debtor and [Mr. Jason Mazzei] have filed four bankruptcies and are five years [now seven years] behind on payments. The foregoing constitutes a scheme to abuse the bankruptcy system and avoid the Debtor's obligations under the Bankruptcy Code." Id. The preponderance of the evidence, as set forth above in this *Memorandum Opinion*, supports these allegations.

Courts have held that a lack of good faith constitutes "cause" for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1). See e.g., Baxter v. Sarmadi, 602 F.App'x 322, 325 (6th Cir. 2015)(citing Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship), 30 F.3d 734, 737-38 (6th Cir. 1994) and Mich. Nat'l Bank v. Charfoos (In re Charfoos), 979

F.2d 390, 392 (6th Cir. 1992)); and Carolin Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1989).  Accordingly, granting the Motion for Relief From Stay appears to be appropriate under the circumstances of this case.

A remaining question is whether the Court should grant "in-rem" relief as part of granting the relief requested by Community Bank.  The Court answers this question in the affirmative.

*In rem* relief has its genesis found at 11 U.S.C. §§ 105(a) and 362(d)(4),[30] and renders the automatic stay in any future bankruptcy case(s) inapplicable to the lender's foreclosure of a particular *res*, regardless of who owns the property or files the subsequent bankruptcy case.  See Gonzalez-Ruiz v. Doral Fin. Corp. (In re Gonzalez-Ruiz), 341 B.R. 371, 384 (B.A.P. 1st Cir. 2006)(citing In re Lord, 325 B.R. 121, 129 (Bankr. S.D.N.Y. 2005)).[31]

---

[30] The Bankruptcy Code provides that if the successful creditor records the order granting *in rem* relief, it will be binding "in any other case under this title" for the next two years, 11 U.S.C. § 362(d)(4)(B), and the stay will not come into effect with the *res* subject to the relief from stay order. 11 U.S.C. § 362(b)(20).

[31] In Gonzalez-Ruiz, the court s*ua sponte* awarded *in rem* relief from stay where the debtors filed four bankruptcy cases, had defaulted on their mortgage payments for years, and had improperly used their four bankruptcy filings as a vehicle to interfere with the creditor's foreclosure.  In the course of upholding *in rem* relief, the court held:

> The bankruptcy court did not err, legally or factually, in granting relief from stay to allow Doral [i.e., the mortgagee] to immediately proceed with its foreclosure sale, and in *sua sponte* granting *in rem* status to such relief.  The allowance of relief from stay *in rem* was warranted by the Debtor's efforts to circumvent the bankruptcy court's prior orders.  Moreover, the *in rem* aspect of the order was necessary and appropriate to insure that the Debtors would not misuse the bankruptcy process again to defeat Doral's legitimate remedies. Section 105(a) specifically empowers the court to act s*ua sponte* in appropriate circumstances.  In its emergency motion to [authorize relief] and dismiss the case, Doral requested that "severe sanctions" be imposed on the Debtors for their abuse of the Bankruptcy Code, and for "such further relief as is just and proper."  It was within the bankruptcy court's discretion to order *in rem* relief as a sanction.

In Gonzalez-Ruiz, 341 B.R. at 384-85.

*In rem* relief "thus addresses circumstances when the debtor is likely to invoke the automatic stay to frustrate foreclosure efforts through repeated [bankruptcy] filings, whether by the same or different persons." In re Gonzalez-Ruiz, at 384. This remedy "directly addresses abuse of the automatic stay by prospectively eliminating it with regard to the lender's collateral even if there are future bankruptcy cases." Id. (citing Aurora Loan Servs. Inc. v. Amey (In re Amey), 314 B.R. 864, 866-67 (Bankr. N.D. Ga. 2004)).

Section 105(a) of title 11 permits the Court to issue any "order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 362(d)(4) of title 11 allows a bankruptcy court to grant *in rem* relief to a secured creditor with an interest in real property if the court finds that a serial bankruptcy filing was the part of a "scheme to delay, hinder, or defraud creditors[.]" Note, the phrase "delay, hinder, or defraud" is written in the disjunctive, and that a demonstration of fraud is not required. In re Kearns, 616 B.R. 458, 467 (Bankr. W.D.N.Y. 2020).

*Sub judice*, Community Bank has demonstrated that the Mazzeis have engaged in serial bankruptcy filings that resulted in hindering or delaying the bank's foreclosure efforts. Thus, the narrow issue for the Court to decide is whether the preponderance of the evidence indicates that such delay or hindrance was the result of a "scheme" perpetrated by Mr. & Mrs. Mazzei.

The Bankruptcy Code does not define the term "scheme." Courts, however, have defined the term as "an intentional artful plot or plan." State Emps. Credit Union of Md., Inc. v. Reckart (In re Reckart), Bankruptcy No. 19-70748-JAD, 2021 WL 136359, at *3 (Bankr. W.D. Pa. Jan. 14, 2021)(citation omitted). Courts have also held that a "showing of good faith weighs against the existence of a scheme to delay, hinder, or defraud." Id. (citing McKeesport Area Sch.

Dist. v. City of Pittsburgh Prop. Dev., Inc. (In re City of Pittsburgh Prop. Dev., Inc.), 580 B.R. 130, 135 (Bankr. W.D. Pa. 2018).

As to the latter—good faith—this Court holds that good faith on the part of the Mazzeis is lacking.  As to the former—an "intentional artful plot or plan" to "hinder or delay"—rarely will a debtor admit to such a nefarious plot.  Therefore, whether such a plot or plan exists must be "extrapolated" or inferred from the facts of each case. In re Garcia, No. 22 B 130, 2022 WL 665825, at *5 (Bankr. N.D. Ill. March 7, 2022).[32]

With respect to the badges of circumstantial evidence supporting a finding of the existence of a "scheme," courts have held that multiple filings alone do not justify *in rem* relief under 11 U.S.C. § 362(d)(4). United States v. Olayer (In re Olayer), 577 B.R. 464, 468-69 (Bankr. W.D. Pa. 2017).

Rather, more circumstantial evidence is needed to infer the presence of a "scheme" to "hinder or delay."  For example, it has been held that commencing multiple cases "without the ability or intention to reorganize" is a factor supporting the inference of a scheme Id. (citation omitted). Courts have also held that serial filings coupled with lack of payments, highly questionable (or unfeasible) plans, and a "tag-team" approach to individual filings by a husband and wife may warrant *in rem* relief. Id.

Stated another way, factors that courts consider as part of their analyses "include (1) the timing of the debtor's bankruptcy cases relative to each other, to proceedings in the foreclosure action, and to scheduled foreclosure sales; (2) the debtor's lack of changed circumstances between cases; (3) dismissal of the

---

[32] Garcia was a case in which husband and wife filed three "strategic" bankruptcies on a tag-team basis.  The court found the filings to have *indicia* of a scheme warranting *in rem* relief when the filings lacked sufficient funding to support a plan, the filings were timed to delay the creditor's collection activity, the debtors did not pay the bank for over two years, and the debtors did not pay any property taxes. Garcia, 2022 WL 665825, at *6.

debtor's previous cases without confirmation or discharge; (4) the debtor's ina-bility to fund a plan; and (5) the debtor's failure to make mortgage payments for a long time." <u>In re Garcia</u>, 2022 WL 665825, at *5.

In examining these factors, this Court concludes that the weight of the evidence reflects the existence of virtually all of these badges, thereby support-ing the presence of a scheme to hinder or delay on the part of the Mazzeis.

That is, this case is the latest effort by the Mazzeis to "tag team" bank-ruptcy filings to enjoin Community Bank's foreclosure efforts.  This case, like all of their others, was underfunded and/or not feasible. In fact, Mr. Jason Mazzei's previous cases failed under a mountain of debt and a lack of sufficient income to remit required payments to creditors.  No material change of circum-stances has occurred between each of the successive bankruptcy filings, and the net effect of the filings is that Community Bank's collection efforts have been held in abeyance all the while arrearages on the Community Bank mort-gage have grown and all the while substantial tax liens further encumber the Mazzeis' real property.

The existence of these circumstances supports finding that the Mazzeis have abused the bankruptcy laws, including the automatic stay, as a result of the filing of multiple unfeasible bankruptcy cases.  Granting Community Bank *in rem* stay relief pursuant to 11 U.S.C. §§ 105(a), 362(d)(1), and 362(d)(4) is therefore appropriate.

## V.

The Court has issued its Rule to Show Cause as to why this case should not be dismissed.  The premise behind the Rule to Show Cause is that Com-munity Bank put the Debtor's good faith at issue, and the Court must now de-cide whether to dismiss this case or convert it to a chapter 7 liquidation.

Statutes guiding the Court's Rule to Show Cause include 11 U.S.C. § 1307(c), which authorizes the Court to convert a chapter 13 case "to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause[.]" Id.   They also include 11 U.S.C. § 105(a) and § 549(a), with the former affording bankruptcy courts the power to issue "any order, process, or judgment" that is "necessary or appropriate" to effectuate the provisions of title 11 and the latter permitting dismissal of cases "with prejudice" if "cause" is shown.

Courts have found sufficient cause exists for dismissal of a bankruptcy case, with prejudice, where good faith is lacking. See In re Kearns, 616 B.R. at 468 and In re Powell, 2022 WL 10189109, at *4 (citing United States Trustee v. Stone Fox Capital LLC (In re Stone Fox Capital LLC), 572 B.R. 582 (Bankr. W.D. Pa. 2017).[33]   Courts have also found sufficient cause exists to dismiss a bankruptcy case with prejudice where the debtor has made material omissions and errors in the schedules and statements. Id. (citing In re Jenkins, No. 13-40793, 2014 WL 268688, *4 (Bankr. W.D. Ky. Jan. 23, 2014).

For the reasons set forth above, this Court concludes that ample cause exists to dismiss this case with prejudice.

---

[33] On this point, In re Blanco is instructive, where the Court wrote:

> In this case, based on the cavernous divide between the magnitude of the arrearage claims secured by the Debtor's real property and the Plan funding, the facial infeasibility of the Plan in light of the Debtor's income and expense disclosures, the Debtor's apparent inability to grasp the need to present a plan that addressed the feasibility issue, his failure to take any action to present any plausible theory for a plan that would satisfy the requirements of 11 U.S.C. § 1325(a) after almost six (6) months and his failure to articulate any other rehabilitative rationale for the chapter 13 case, I concluded that the Chapter 13 Trustee's request for dismissal of the case for undue delay that was prejudicial to creditors was appropriate.

In re Blanco, 520 B.R. at 484 (footnotes omitted).

The record reflects that the series of bankruptcies filed by the Mazzeis, have not been filed in good faith and have clogged the courts for years. These cases are obviously inconsistent with what is right or proper. To borrow the words of other courts, such conduct by the Mazzeis has been "flagrant" (and such term is synonymous with "egregious"). <u>Rickabaugh v. Rickabaugh (In re Rickabaugh)</u>, Case No. 1:20-bk-3505-HVW, 2021 WL 3520193, *3 (Bankr. M.D. Pa. Aug. 10, 2021 (citing <u>In re Tamecki</u>, 229 F.3d 205, 207 (3d Cir. 2000)). Such conduct also supports conversion or dismissal of the instant case. Based on the totality of the circumstances, the Court elects to dismiss this case with prejudice.

In rendering this decision to dismiss the Debtor's case with prejudice, the Court has considered the interests of the creditors because "they are the best judge of their own best interests," <u>In re Soppick</u>, 516 B.R. at 764 (citation omitted). Along this vein, the Court notes that no creditor has come forward and requested that the Court convert this case to a chapter 7 liquidation in *lieu* of dismissal; and neither the Chapter 13 Trustee nor the Debtor have made such a request. <u>Id</u>. at 765.[34]

In reaching this decision, the Court has also considered the fact that the lion's share of the Mazzeis' debts are secured creditors and/or tax creditors who have extra protections outside of the bankruptcy process to recover their claims.

Accordingly, the Court concludes that dismissal of the case, with prejudice, with a 180-day bar against re-filing, is an appropriate sanction for the abuse of the bankruptcy system occasioned by the series of "tag team" and un-

---

[34] The Court surmises that the Debtor has not made a request to convert this case to a chapter 7 because Mr. & Mrs. Mazzei have no interest in liquidating the Allison Park Property. This surmise is supported by the fact that at no time did Mrs. Mazzei offer to amend her chapter 13 plan to sell the $1.385 million asset for the benefit of creditors.

feasible bankruptcies filed by the Mazzeis. The 180-day bar chosen by the Court strikes an appropriate balance between holding the Debtor accountable, protecting creditor interests, and yet not permanently foreclosing the Debtor from seeking a bankruptcy discharge of *in personam* debts at a later date.

****

For the reasons set forth above, the Court shall enter separate orders which (1) deny confirmation of the Debtor's Amended Plan, (2) grant *in rem* relief from stay in favor of Community Bank with respect to the Allison Park Property, and (3) dismiss this bankruptcy case with prejudice (with a 180-day bar against future re-filing).

Dated: October 4, 2023

jlh

The Honorable Jeffery A. Deller
United States Bankruptcy Judge

FILED
10/4/23 3:38 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

Cc: Counsel of Record